**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| TRINA M. SMITH, | ) | CASE NO. 3:13-CV-713 |
| | ) | |
| Plaintiff, | ) | JUDGE HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | | |

Plaintiff, Trina M. Smith ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"),

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant

to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends

that the Commissioner's final decision be AFFIRMED.

## I.  PROCEDURAL HISTORY

On May 12, 2009, Plaintiff filed applications for DIB, POD, and SSI and alleged a

disability onset date of November 10, 2008.  (Transcript ("Tr.") 10.)   The applications

were denied initially and upon reconsideration, and Plaintiff requested a hearing before

an administrative law judge ("ALJ").  (*Id.*)  On June 28, 2011, ALJ Melissa Warner held

Plaintiff's hearing.  (*Id.*)  Plaintiff appeared, was represented by an attorney, and

testified.  (*Id.*)  A vocational expert ("VE") also testified.  (*Id.*)  On September 13, 2011, the ALJ found Plaintiff not disabled.  (Tr. 7.)  On January 28, 2013, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)  On April 1, 2013, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this matter.[1]  (Doc. Nos. 13, 14, 15.)

Plaintiff asserts the following assignments of error: (1) the ALJ did not accurately account for Plaintiff's low intellectual functioning; (2) the ALJ failed to properly consider Plaintiff's cardiovascular impairment; (3) the ALJ failed to properly consider Plaintiff's obesity; (4) the ALJ failed to give appropriate weight to the opinions of Plaintiff's treating physicians; and (5) the VE's testimony was based on an improper hypothetical and is not consistent with the actual limitations supported by the record.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Plaintiff was born in December 1970, and was 37-years-old on her alleged disability onset date.  (Tr. 23.)  She had at least a high school education and was able to communicate in English.  (*Id.*)  She had past relevant work as a home daycare provider and a teacher's aide.  (*Id.*)

### B.  Medical Evidence

---

[1]     Plaintiff's counsel is reminded that in accordance with this Court's Initial Order (Doc. No. 7), and the practice of law in federal courts generally, all factual recitations should be accompanied by citations to the record. Furthermore, all legal assertions must be accompanied by citations to appropriate cases or regulations.

### 1.    Physical Limitations

### a.    Medical Reports

Plaintiff was admitted to St. Vincent Mercy Medical Center from April 15, 2003, through April 24, 2003, for congestive heart failure, pneumonia, uncontrolled hypertension, and obstructive sleep apnea.  (Tr. 294.)  She was stabilized on medications.  (*Id.*)  At discharge, she was advised that she could engage in regular activity with no restrictions.  (*Id.*)  Plaintiff followed up treatment at St. Vincent's Heart Failure Clinic and St. Vincent's Sleep Disorders Centers, where she was diagnosed with moderate obstructive sleep apnea.  (Tr. 297-332, 333-338, 342-370.)  Treatment notes indicate that Plaintiff was unable to tolerate either continuous positive airway pressure ("CPAP") or bilevel positive airway pressure ("BIPAP") due to a persistent cough and should instead treat with oxygen therapy. (Tr. 338.)  Plaintiff was encouraged to lose weight, as doing so would help with her sleep apnea.  (*Id.*)

Plaintiff also followed up with cardiologist Mohammed Alkhateeb, M.D., on July 29, 2003. (Tr. 454.)  Extensive testing was negative for ischemia or other ongoing cardiac conditions.  (Tr. 455-456.)  Dr. Alkhateeb recommended a cardiac catheterization, but it appears this was never done, and Plaintiff told her nephrologist that she had refused.  (Tr. 463, 767.)  Dr. Alkhateeb's records do not indicate any symptoms of recurrent heart failure.  (Tr. 454-497.)  Plaintiff's most recent echocardiogram, performed May 3, 2010, indicated only mild findings, with a left ventricular ejection fraction of 45 percent.  (Tr. 711-712.)

Plaintiff saw pulmonologist Karl Fernandes, M.D., from August 28, 2003, through

3

February 18, 2010.  (Tr. 394-414, 627-628.)  After 2004, Plaintiff's visits were rare and sporadic; she saw Dr. Fernandes only four times from 2006 to 2010.  (*Id.*)  Dr. Fernandes's records indicate that Plaintiff was discharged from his practice on July 10, 2008, because she had stopped taking all of her medications on her own and had no need for further pulmonary treatment.  (Tr. 394, 396.)

On March 5, 2009, Plaintiff returned to Dr. Fernandes due to congestion problems.  (Tr. 394.)  Dr. Fernandes reported that Plaintiff had stable sleep apnea treated with oxygen therapy at night due to Plaintiff's intolerance of CPAP.  (*Id.*)  Upon examination, Plaintiff's lungs were clear with good air movement and no wheezes, rhonchi, or rales, and her oxygen saturation level on room air was 97 percent.  (*Id.*)  She had no edema.  (*Id.*)  Dr. Fernandes diagnosed Plaintiff with acute sinusitis and prescribed medications.  (Tr. 395.)  After another year of absence from Dr. Fernandes' practice, Plaintiff saw Dr. Fernandes on February 18, 2010, with complaints of a chronic cough.  (Tr. 627.)  Dr. Fernandes noted that Plaintiff was not taking any pulmonary medications.  (*Id.*)  He determined that Plaintiff's cough was related to an acute episode of sinusitis and bronchitis.  (Tr. 628.)

Plaintiff saw her primary care physician, Stanley Orlop, D.O., from June 13, 2003, through April 21, 2011.  (Tr. 498-557, 587-602, 739-762.)  Dr. Orlop initially diagnosed congestive heart failure, hypertension, obstructive sleep apnea, asthma/chronic obstructive pulmonary disease, and depression, but his records indicate that Plaintiff received most or all of her treatment for these conditions from her specialists.  (*Id.*)  On March 1, 2007, Dr. Orlop also diagnosed diabetes mellitus, type II.

4

(Tr. 514.)  Dr. Orlop prescribed oral Glucophage.  (Tr. 511.)  On July 3, 2009, a measure of Plaintiff's kidney function indicated stage 2 kidney disease (mild kidney damage).  (Tr. 606.)  As the ALJ noted, Dr. Orlop's treatment was generally limited to prescribing and adjusting Plaintiff's medications, and the clinical findings contained in his records are generally unremarkable other than laboratory reports showing high blood glucose levels and indicators of kidney disease.  (Tr. 19, 498-557, 587-602, 739-762.)

On January 15, 2008, Dr. Orlop opined that Plaintiff can stand and walk for two to four hours in an eight-hour day, up to one hour without interruption; she can sit for up to six hours in an eight-hour day, two hours without interruption; she can lift and carry up to five pounds frequently; and she is markedly limited in pushing and pulling and moderately limited in bending.  (Tr. 386.)  Dr. Orlop concluded that Plaintiff is employable with such restrictions.  (*Id.*)  In a separate document of the same date, Dr. Orlop opined that Plaintiff cannot stand, sit, or walk for long periods, perform heavy lifting, or tolerate temperature extremes.  (Tr. 523.)

On October 18, 2010, Dr. Orlop referred Plaintiff to a nephrologist, Molly Litvin, D.O.  (Tr. 763-776.)  Plaintiff reported feeling fairly well and denied having any problems with shortness of breath, significant lower extremity swelling, urinary symptoms, chest pain, or unusual fatigue.  (Tr. 767.)  She had no edema on examination.  (*Id.*)  On October 29, 2010, Dr. Litvin referred Plaintiff for an echogram of her kidneys, which showed mild chronic renal disease and simple renal cysts.  (Tr. 715.)  Dr. Litvin diagnosed chronic kidney disease, stage II, secondary to hypertensive/diabetic nephrosclerosis, as well as hypertension, mild hypokalemia, and

5

proteinuria.  (Tr. 764, 768.)  She adjusted Plaintiff's medications.  (Tr. 765, 769.)

> **b.    Agency Reports**

On September 22, 2009, Plaintiff underwent a consultative examination by William Padamadan, M.D.  (Tr. 578-580.)  An examination of Plaintiff's lungs was normal overall, and she had no edema.  (Tr. 579-580.)  Dr. Padamadan diagnosed morbid obesity, a history of obstructive sleep apnea on a CPAP and oxygen at night, hypertension, type II diabetes, and a history of asthma, which he reported was more compatible with obstructive sleep disorder and obesity.  (Tr. 580.)  Dr. Padamadan opined that Plaintiff may have difficulty climbing poles or ladders, balancing on beams, and walking on scaffolds.  (*Id.*)  He did not indicate any other physical limitations, and noted that Plaintiff's communication skills and attention span were excellent.  (*Id.*)

On November 17, 2009, state agency medical consultants Dr. McCormack and Dr. Steinberg determined that Plaintiff's impairments of asthma, obstructive sleep apnea, diabetes mellitus, and hypertension are non-severe impairments, and that her cardiac condition is not a medically determinable impairment.  (Tr. 585-586.)

> **2.    Mental Limitations**

> **a.    Medical Reports**

Plaintiff was prescribed Lexapro while being treated at the St. Vincent's Heart Failure Clinic in 2003, as she was observed to have a flat affect and admitted to feeling depressed.  (Tr. 348, 350.)  Treatment notes from January 2004 indicate that Plaintiff reported feeling better, believing Lexapro was effective; however, she later indicated that she never actually took the medication because she was afraid of potential side

6

effects.  (Tr. 347, 442.)

On June 7, 2007, Plaintiff sought treatment at Unison Behavioral Health Group ("Unison"), for episodes of depression.  (Tr. 426-453.)  She reported not wanting to get out of bed, being constantly irritated and tired, isolating herself, and having crying spells, difficulty concentrating and sleeping, and suicidal thoughts and hallucinations. (Tr. 442.)  She attributed her depression to illness and financial difficulties.  (Tr. 440, 442.)  Upon examination, Plaintiff had a down mood with a congruent affect, but fair insight and judgment, normal psychomotor activity, and no significant deficits in memory, attention, or concentration.  (Tr. 441.)  Her intellect was average, per verbal communication.  (*Id.*)  Plaintiff's Global Assessment of Functioning ("GAF") score was estimated to be 55.[2]  (Tr. 441, 448.)  Tufal Khan, M.D., diagnosed Plaintiff with depressive disorder, started her on a trial of Celexa, and referred her for counseling. (Tr. 441.)

By June 9, 2008, Plaintiff reported that she was doing well and had no problems with sleep, appetite, interest, energy, mood instability, or irritability.  (Tr. 439.)  She had been exercising and was feeling good about herself.  (*Id.*)  Upon examination, her mood was euthymic, her affect was full, her thought process was linear and goal-directed, and her thought content was negative for hallucinations or delusions.  (*Id.*)  She denied any suicidal or homicidal ideations and had no significant deficits in memory, attention, or

---

[2]     The GAF scale incorporates an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health illness devised by the American Psychiatric Association.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

7

concentration.  (*Id.*)

On February 23, 2009, Plaintiff reported that her depression was under control.
(Tr. 432.)  At an appointment with Dr. Khan on March 23, 2009, Plaintiff said that she
was doing "okay" and did not have any complaints.  (Tr. 429.)  On examination, her
thought process was linear and goal-directed, her thought content was negative for
hallucinations or delusions, and she denied any suicidal or homicidal ideations.  (*Id.*)
As the ALJ noted, although the remainder of Dr. Khan's records show that Plaintiff had
periods of exacerbation due to family stressors, the clinical findings upon mental status
examinations of Plaintiff continued to be generally unremarkable.  (Tr. 20, 426-453.)

Records from Unison indicate that Plaintiff stopped receiving psychological
treatment in 2009, but became symptomatic again after being off her medication for
more than six months.  (Tr. 668-710.)  She returned to counseling on May 17, 2010,
and began seeing Irfan Ahmed, M.D.  (Tr. 683.)  On examination, Plaintiff was found to
be depressed and withdrawn, but not suicidal or homicidal.  (*Id.*)  Plaintiff was
prescribed Wellbutrin and provided with supportive therapy.  (Tr. 683-684.)  At her next
appointment, she reported paranoia and anxiousness after taking Wellbutrin.  (Tr. 679.)
She appeared "very sick and tired" and looked withdrawn and depressed but
interactive.  (*Id.*)  On April 2, 2010, Plaintiff looked depressed and upset and cried
during her interview with Dr. Ahmed.  (Tr. 677.)  She reported having been off her
medication for over a month.  (*Id.*)  By the end of August 2010, Plaintiff's symptoms had
improved significantly with treatment and medication.  (Tr. 674.)  She had been taking
her medication regularly and tolerating it well, reporting no side effects, and she denied

8

any worsening symptoms of depression.  (*Id.*)  At her most recent visit with Dr. Ahmed on May 19, 2011, Plaintiff reported feeling well on her current medication.  (Tr. 668.)

### b.  Agency Reports

On July 6, 2005, Plaintiff underwent a consultative psychological examination by Roger Avery, Ed.S., in connection with a prior claim for benefits.  (Tr. 373-379.)  Plaintiff reported that she did not have any problems performing physical activities, and that she had refused to take any medications for her psychological symptoms.  (Tr. 373-374.)  At the time of the evaluation, she was working 20-25 hours per week at a summer program where she fed children in the community.  (Tr. 374.)  Upon evaluation, Plaintiff attained an IQ score of 71, which was at the bottom end of the borderline range for intellectual functioning.  (Tr. 377.)  She attained memory test scores in the mildly mentally retarded range.  (Tr. 378.)  Her reading comprehension scores were at the 5.5 grade level.  (*Id.*)  Mr. Avery diagnosed major depressive disorder, noncompliance with treatment, a relational problem, a reading disorder, and a personality disorder.  (*Id.*)  He estimated Plaintiff's GAF to be 50-55.  (*Id.*)  Mr. Avery concluded that Plaintiff had a moderate to marked impairment in her ability to understand, remember, and follow directions due to her memory problems, and moderate impairments in other work-related mental functioning due to her borderline intellectual abilities.  (Tr. 379.)

On August 24, 2009, Patricia Semmelman, Ph.D., completed a psychiatric review technique and a mental residual functional capacity ("RFC") assessment.  (Tr. 558-571, 572-575.)  Dr. Semmelman opined that Plaintiff has a mild restriction in her activities of daily living, moderate difficulties in social functioning, and no difficulties in

9

maintaining concentration, persistence, and pace.  (Tr. 568.)  Dr. Semmelman

concluded that Plaintiff can interact occasionally and superficially in a non-public setting

and cope with ordinary and routine changes in an environment without a fast pace or

high demand.  (Tr. 574.)

**C.    Hearing Testimony**

**1.    Plaintiff's Testimony**

Plaintiff was 40-years-old at the time of her hearing and had a 20-year-old

daughter and 15-year-old son.  (Tr. 39.)  She has a driver's license and has no

difficulties driving.  (*Id.*)  She completed high school and is able to read, write, and do

basic math.  (*Id.*)  The last time she worked was November of 2008 in a daycare.  (Tr.

40.)  She also has past work experience as a teacher's aide and in a summer program

where she cooked for and fed children.  (Tr. 55.)  When asked what keeps Plaintiff from

working, she testified that she gets tired easily and is constantly going to the restroom.

(Tr. 40.)  She stated that this has been going on since she was diagnosed with

congestive heart failure in 2003.  (*Id.*)  She testified that she still experiences pain in her

chest.  (Tr. 52.)  She sometimes uses oxygen during the day when she becomes really

exhausted.  (*Id.*)

Plaintiff sleeps about six hours on an average night.  (Tr. 42.)  She often gets up

in the middle of the night to use the restroom.  (*Id.*)  She suffers from depression, which

started when she first got sick.  (Tr. 43.)  The medications she takes for her depression

are helpful.  (*Id.*)  She still has feelings of isolation about once or twice a month.  (Tr.

43-44.)

10

On a typical day, Plaintiff takes her kids places, naps, and prepares meals.  (Tr. 44.)  Her children do most of the chores, but she can do laundry and cook.  (*Id.*) Plaintiff watches TV, reads, and takes her children to the movies.  (Tr. 44, 47)  She watches reality TV and is usually able to follow what is going on in the shows.  (Tr. 44.) She is able to shower, dress, and feed herself.  (*Id.*)  She can walk about 20 minutes before she gets tired and has to sit down.  (Tr. 45.)  She believes she could walk about a block and a half before having to stop.  (Tr. 49.)  She can stand for about 15 or 20 minutes before her feet begin to hurt and her ankles begin to swell.  (Tr. 45.)  When she lies down at home, she elevates her feet.  (*Id.*)  Plaintiff can sit for about an hour.  (*Id.*) When asked what keeps her from sitting longer, she replied, "I don't know, I just never sit that long."  (*Id.*)  She testified that she can lift a gallon of milk in each hand.  (Tr. 45-46.)  She can lift one gallon of milk above her head.  (Tr. 49.)  She can bend and touch her knees or the floor.  (Tr. 46.)  She can climb stairs.  (*Id.*)

Plaintiff has a cyst on her right hand.  (*Id.*)  She is right-handed.  (*Id.*)  She testified that sometimes her fingers go numb because of the cyst on her hand.  (Tr. 47.) Plaintiff stated that doctors want to do surgery on her hand, but that she does not want to have the surgery because "[i]t's not broke yet, so I'm not going to fix it."  (*Id.*)  Despite the cyst, Plaintiff can still cook, write, and type on a keyboard until her hand begins to stiffen.  (*Id.*)

Plaintiff does not get along with other people very well.  (*Id.*)  "Because I'm older now, and I don't take, I don't deal with people's mess too much."  (*Id.*)

Plaintiff has sleep apnea, which she testified would be better if she used her

breathing machine more often.  (Tr. 48.)  She does not use the machine because she has to get up at least three or four times per night to use the bathroom.  (*Id.*)  Plaintiff testified that she has a respiratory problem, but that it is getting better due to the use of an inhaler.  (*Id.*)

Plaintiff has retinopathy in her left eye.  (Tr. 50.)  She goes to an eye doctor every six months to make sure it does not get any worse.  (*Id.*)  She also has cysts on her kidneys and is in the beginning stages of kidney disease.  (*Id.*)  Over the last three or four years, Plaintiff has lost interest in going places.  (Tr. 50-51.)  She still goes to the movies with her kids, but not as often as she used to.  (Tr. 51.)  "You know I can't just sit there and watch a movie, a whole movie.  I have to go to the restroom."  (*Id.*)

## 2.  VE Testimony

A vocational expert, Mr. McBea, testified at Plaintiff's hearing.  (Tr. 54.)  The ALJ told him to assume a hypothetical individual vocationally situated as Plaintiff, who can perform all the functions of light work except only occasional climbing of stairs and stooping; no climbing of ladders; frequent fingering; no exposure to temperature extremes and humidity; occasional exposure to respiratory irritants; no exposure to obvious hazards; work at a specific vocational preparation ("SVP") of one to two[3]; occasional contact with the general public; and occasional keyboard use.  (Tr. 56-57.)

---

[3]     SVP ratings indicate how long it takes a worker to learn how to do his or her job at an average performance level.  A rating of SVP 1 means a short demonstration is the amount of training required to learn the job, and a rating of SVP 2 means up to one month of training is required to learn the job.

The VE testified that the hypothetical individual could perform work at the light

exertional level, which would include jobs such as an inspector or hand packager (3,000

jobs in Ohio; 125,000 nationally); a bagger of garments (2,000 jobs in Ohio; 100,000

nationally); and a photocopy machine operator (1,500-2,000 jobs in Ohio; 100,000

nationally).  (Tr. 57-58.)  The VE testified that the individual could perform the

aforementioned jobs even with a sit/stand option allowing the individual to change

positions every thirty minutes for one to two minutes in the immediate vicinity of the

workstation.  (Tr. 58.)

The ALJ presented a second hypothetical where the individual previously

described would have a sit/stand option and could sit for six out of eight hours, stand or

walk for two out of eight hours, and lift 20 pounds occasionally and ten pounds

frequently.  (*Id.*)  The VE testified that if the individual had to sit the majority of the time,

other occupations would be more appropriate than the ones he previously mentioned,

such as a production assembler (10,000-13,000 jobs in Ohio; 180,000 nationally); a

small products assembler (10,000 jobs in Ohio; 175,000 nationally); and a blending

tank helper (1,500 jobs in Ohio; 90,000 nationally).  (Tr. 59.)

The VE testified that ordinary breaks in the course of a workday include a 15-

minute break in the morning, a 15-minute break in the afternoon, and generally a 30-

minute lunch.  (*Id.*)  The VE further stated that consistently missing more than one day

of work per month and beyond any sick time or vacation time normally allotted would

result in a severe reprimand for the employee and ultimately dismissal.  (Tr. 59-60.)

According to the VE, an accumulation of ten missed workdays over the year also results

in termination, and at an entry level job there is generally a 90-day probationary period

13

when no days can be missed.  (Tr. 60.)  The VE also testified that in competitive employment, generally one is required to be on-task for a minimum of at least 80 percent of the day, which includes breaks.  (*Id.*)  To go beyond that would preclude employment.  (*Id.*)  As for restroom breaks, the VE explained: "On an unscheduled basis, generally in competitive employment, one is given restroom breaks as needed. However, when those restroom breaks become to the point where the individual's off-task as I have stated earlier, reaching that 20 percent or more, then that's when it becomes a problem for the employer, and the employer again will meet the employee with reprimand or dismissal."  (*Id.*)

Plaintiff's counsel presented a hypothetical to the VE, which included the same limitations as stated by the ALJ, but added that the individual would be limited to superficial interaction with co-workers and supervisors and no contact with the public. (Tr. 60-61.)  The VE opined that the jobs he previously identified would not meet that hypothetical.  (Tr. 61.)

Plaintiff's counsel then presented another hypothetical to the VE: the individual can walk two to four hours in an eight-hour workday for only a half-hour to one hour at a time; sit four to six hours in an eight-hour workday for only two hours at a time; and can lift up to only five pounds maximum frequently and five pounds occasionally.  (Tr. 61.) The hypothetical individual is markedly[4] limited in pushing and pulling, moderately[5]

---

[4]     Plaintiff's counsel defined "markedly" limited as meaning the individual could not perform the task up to two-thirds of the day.  (Tr. 61.)

[5]     Plaintiff's counsel defined "moderately" limited as meaning the individual could not perform the task up to one-third of the day.  (Tr. 62.)

14

limited in bending, and is not limited in reaching or handling but could only have very occasional use of a keyboard.  (Tr. 62.)  The individual has a 5.5 grade reading and comprehension level, borderline intellectual functioning, and would need to be in a low-stress job that does not involve a high pace of production.  (Tr. 63.)  The VE testified that the hypothetical individual Plaintiff's counsel described would not be able to perform any work in the national economy.  (Tr. 64.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of

15

disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   Plaintiff meets the insured status requirements of the Social Security Act through September 30, 2009.

2.   Plaintiff has not engaged in substantial gainful activity since November 10, 2008, the alleged onset date.

3.   Plaintiff has the following severe impairments: obesity; obstructive sleep apnea; asthma; diabetes mellitus with chronic kidney disease; borderline intellectual functioning; and a major depressive disorder.

4.   Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry

20 pounds occasionally and 10 pounds frequently, stand and walk for two hours in an eight-hour workday, sit for six hours in an eight-hour workday, and requires the option to change positions every 30 minutes for one to two minutes while remaining in the immediate vicinity of her work station. She cannot climb ladders, but can occasionally climb stairs, stoop, and use a keyboard, and can frequently finger. She cannot tolerate exposure to temperature extremes, humidity, or obvious hazards, but can occasionally tolerate exposure to respiratory irritants. She is limited to work involving specific vocational preparation of Level 1 or Level 2, with only occasional contact with the general public.

6. Plaintiff is unable to perform any past relevant work.

7. Plaintiff was born in December 1970, and was 37-years-old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8. Plaintiff has at least a high school education and is able to communicate in English.

. . . . .

10. Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

11. Plaintiff has not been under a disability, as defined in the Act, from November 10, 2008, through the date of this decision.

(Tr. 12-24.)

## LAW & ANALYSIS

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in

the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B. Plaintiff's Assignments of Error

#### 1. The ALJ did not Accurately Account for Plaintiff's Low Intellectual Functioning.

Plaintiff argues that substantial evidence does not support the ALJ's RFC determination, because the ALJ did not accurately account for Plaintiff's low intellectual functioning when presenting the hypothetical to the VE. Plaintiff contends that by limiting her to unskilled work requiring an SVP of 1 or 2, the ALJ did not account for Plaintiff's borderline intellectual test scores, specifically those found by consultative examiner Roger Avery, Ed.S., in 2005. According to Plaintiff, the ALJ should have limited Plaintiff to "simple, repetitive, one-step two-step; reasoning 1 type jobs."

18

(Plaintiff's Brief ("Pl.'s Br.") at 16.)  The Commissioner responds that the ALJ adequately accounted for Plaintiff's credible mental limitations, as the evidence shows that Plaintiff has the mental capacity to perform unskilled work.  For the following reasons, Plaintiff's argument is not well taken.

At the fifth and final step of an ALJ's analysis, the ALJ must determine whether, in light of the claimant's RFC, age, education, and past work experience, the claimant can make an adjustment to other work.  20 C.F.R. § 404.1520(a)(4).  At this step, the burden shifts to the Commissioner to prove the  existence of a significant number of jobs in the national economy that a person with the claimant's limitations could perform. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).  To meet this burden, there must be a finding supported by substantial evidence that the claimant has the vocational qualifications to perform specific jobs.  *Workman* v. Comm'r of Soc. Sec., 105 F. App'x 794, 799 (6th Cir. 2004) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)).  Substantial evidence may be produced through reliance on the testimony of a VE in response to a hypothetical question, but only if the question accurately portrays the claimant's individual physical and mental impairments.  *Workman*, 105 F. App'x at 799 (quoting *Varley*, 820 F.2d at 779).

Here, the ALJ adequately portrayed Plaintiff's mental limitations when posing a hypothetical to the VE, because the ALJ limited Plaintiff to unskilled work involving SVP of Level 1 or Level 2.  (Tr. 17, 57 .)  SVP means "the amount of time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  20 C.F.R. § 656.3. A rating of SVP 1 means a short demonstration is the amount of training required to

learn the job, and a rating of SVP 2 means up to one month of training is required to learn the job. *Id.* The regulations define unskilled work as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time . . . and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed." 20 C.F.R. § 404.1568.

In arguing that the ALJ should have accounted for Plaintiff's "borderline intellectual functioning bordering on mild mental retardation," Plaintiff relies on the findings from consultative examiner Avery's 2005 evaluation.[6]  (Pl.'s Br. 16, Tr. 373-379.)  As the ALJ explained in her decision, however, she gave only "some" weight to Mr. Avery's opinion, because

> the evidence does not show that [Plaintiff's] memory impairment is as severe as Mr. Avery indicated; notably [Plaintiff] performed semi-skilled work in the past, even after Mr. Avery's evaluation, and her own treating psychiatrist found that she had no significant deficits in memory, attention or concentration upon his initial examination in 2007 (Exhibit 4D; 12F, p. 21; 19E).  The assessed residual functional capacity for work with specific vocational preparation of Level 1 or Level 2 accommodates [Plaintiff's] impairments in both memory and

---

[6]  At Mr. Avery's evaluation, Plaintiff attained an IQ score of 71, which was at the bottom end of the borderline range for intellectual functioning.  (Tr. 377.)  She attained memory test scores in the mildly mentally retarded range.  (Tr. 378.)  Her reading comprehension scores were at the 5.5 grade level.  (*Id.*)  Mr. Avery opined that Plaintiff's mental ability to relate to others is moderately impaired; her mental ability to understand, remember, and follow instructions is moderately impaired based on her borderline range of verbal and performance intelligence and markedly impaired based on her mild mental retardation range of working memory; her mental ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks is moderately impaired based on her borderline range of processing speed; and her mental ability to withstand the stress and pressures associated with day-to-day work activities is moderately impaired.  (Tr. 379.)

intellectual functioning.

(Tr. 22.)  Thus, the ALJ provided a satisfactory explanation for why she did not adopt all of Mr. Avery's opinions about Plaintiff's limitations when determining Plaintiff's RFC and explained as follows: Some of Mr. Avery's findings conflicted with the findings of Plaintiff's treating psychiatrist, Dr. Khan; Plaintiff had been capable of performing semi-skilled work and was performing such work at the time of Mr. Avery's evaluation; and the ALJ's RFC determination accounted for Plaintiff's mental impairments by limiting her to SVP Levels 1 or 2.  (*Id.*)

Moreover, Plaintiff's argument is without merit, because substantial evidence supports the ALJ's RFC determination.  While one-time examiner Mr. Avery found that Plaintiff's ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks was moderately impaired, treating psychiatrist Dr. Khan found that Plaintiff had no significant deficits in memory, attention, or concentration.  (Tr. 22, 709.)  He also found that Plaintiff's abstract thinking was intact, her intellect was average, and she had fair insight and judgment.  (Tr. 709.)  Dr. Ahmed, another treating psychiatrist on staff at Unison, found that Plaintiff's short and long-term memory was in tact, her abstract reasoning was "fine," and her insight and judgment were fair.  (Tr. 683.)  Furthermore, state agency reviewing psychologist Dr. Semmelman found that Plaintiff had the mental functional capacity to understand, remember, and carry out simple instructions, which is consistent with unskilled work.[7]  (Tr. 572.)  Accordingly,

---

[7]     The ALJ gave "reduced weight" to Dr. Semmelman's opinion that Plaintiff was not limited in her ability to maintain concentration, persistence, and pace, noting that plaintiff does have some limitation in that area.  (Tr. 22,

substantial evidence in the record supports the ALJ's finding that Plaintiff could perform

unskilled work at SVP 1 or 2. Plaintiff's first assignment of error presents no basis for

remand.

### 2. The ALJ Erred in Finding Plaintiff's Cardiovascular Impairment to be Non-Severe.

Plaintiff argues that there is insufficient evidence to support the ALJ's conclusion

that her cardiovascular impairment is non-severe. Plaintiff notes, "[a]mazingly with all

diagnoses, findings, treatment with diuretics, etc., [the] ALJ found no severe

cardiovascular impairment. This is simply not supported by substantial evidence. The

obvious tie to diabetes, renal diseases, asthma, [obstructive sleep apnea], and obesity,

all contribute to Plaintiff['s] severe cardiovascular impairment which was improperly

minimized by [the] ALJ." (Pl.'s Br. 20.) The Commissioner responds that the evidence

of record supports the ALJ's finding that Plaintiff does not have a cardiac impairment

that would have more than a minimal effect on her ability to work.

Plaintiff's arguments are not well taken. As a preliminary matter, even if the ALJ

erred in concluding, at step two of her analysis, that Plaintiff's cardiovascular

impairment was non-severe, that error is harmless. Although the determination of

severity at the second step of a disability analysis is a *de minimis* hurdle in the disability

determination process, *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988), the goal of

the test is to screen out totally groundless claims, *Farris v. Sec'y of Health & Human*

*Servs.*, 773 F.2d 85, 89 (6th Cir.1985). Once an ALJ determines that a claimant suffers

---

572.) The ALJ accommodated this impairment by limiting Plaintiff to SVP
1 or 2. (Tr. 17.)

22

a severe impairment at step two of her analysis, the analysis proceeds to step three; accordingly, any failure to identify other impairments or combinations of impairments as severe would be only harmless error because step two would be cleared. *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (citing *Maziars v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence.").  An ALJ must consider all of a claimant's impairments, severe and not severe, at every subsequent step of the sequential evaluation process.  *See* 20 C.F.R. § 404.1545(e).

Here, although the ALJ concluded that Plaintiff's congestive heart failure ("CHF") and hypertension were non-severe, she found that Plaintiff's obesity, obstructive sleep apnea, asthma, diabetes mellitus with chronic kidney disease, borderline intellectual functioning, and major depressive disorder were severe impairments.  (Tr. 12.) Accordingly, Plaintiff cleared step two of the analysis.  *See Anthony*, 266 F. App'x at 457.

To the extent Plaintiff argues that her cardiovascular condition was sufficiently severe to merit further limitations in her RFC, that argument lacks merit.  It is well established that the claimant bears the burden of establishing the severity of the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) ("The determination of a claimant's Residual Functional Capacity is a determination based upon the severity of his medical and mental impairments. This

determination is usually made at stages one through four [of the sequential process for determining whether a claimant is disabled], *when the claimant is proving the extent of his impairments*.") (emphasis added).  As the ALJ notes, the record shows that Plaintiff has a history of CHF and was hospitalized for this condition in 2003, prior to the alleged onset date.  (Tr. 13.)  However, no recurrence of CHF is documented in the record, and Plaintiff points to no evidence showing that her 2003 diagnosis of CHF interfered with her ability to perform basic work activities.  Furthermore, the ALJ found that "other than its possible role in the development of the claimant's kidney disease (*see* Exhibit 33F), the record does not show that the claimant's hypertension, in and of itself, has more than a minimal effect on her ability to work."  (*Id.*)  Plaintiff offered no medical opinions and no agency physician opinions indicating that her previous diagnosis of CHF or her hypertension left her unable to work or otherwise created restrictions on her ability to perform work activities.  Rather, Plaintiff points to the medical records documenting her complaints of tiredness, frequent urination, chest pain and tightness, and high blood pressure, as well as her physicians' diagnosis and treatment she received for her cardiovascular conditions.  This evidence, however, says nothing about the severity of Plaintiff's impairment.  *See, e.g., Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir. 1988) ("The mere fact that plaintiff suffered from a dysthymic disorder . . . does not automatically entitle plaintiff to the receipt of benefits.  Rather, in order to qualify for the receipt of benefits . . . plaintiff must show that she was disabled by her dysthymic disorder."); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition.").  Accordingly,

Plaintiff failed to sustain her burden of proof with respect to whether her cardiovascular condition constituted a severe impairment that merited further limitations in her RFC.

Furthermore, as the Commissioner correctly notes, the ALJ did not err in her assessment of Plaintiff's cardiovascular impairment, as substantial evidence supports the ALJ's finding that Plaintiff did not have a cardiac impairment that would have more than a minimal effect on her ability to work.  In addition to finding that the record does not indicate a diagnosis of CHF since 2003, the ALJ specifically addressed Plaintiff's treatment with Dr. Alkhateeb, a cardiologist.  (Tr. 19.)  Dr. Alkhateeb's testing was consistently negative for ischemia or other ongoing cardiac conditions.  (Tr. 19, 454-490.)  The ALJ noted that in 2005, when Plaintiff had an episode of lower extremity edema, it was treated by increasing her Lasix, and at subsequent appointments, only trace edema was observed.  (Tr. 19, 473, 476, 477.)  Furthermore, the ALJ noted that although Plaintiff continued to report shortness of breath and fatigue, Dr. Alkhateeb attributed this to her failure to use her CPAP machine for sleep apnea, not to CHF, and that Plaintiff's most recent echocardiogram of May 3, 2010, indicated only mild findings. (Tr. 19, 476-477, 711-712.)  Thus, substantial evidence supports the ALJ's conclusion that Plaintiff's cardiovascular impairments are non-severe, and remand is not appropriate on this issue.

### 3.    The ALJ Failed to Properly Consider Plaintiff's Obesity When Determining Plaintiff's Residual Functional Capacity.

Plaintiff argues that the ALJ did not consider her obesity in accordance with SSR 02-1p when determining her RFC.  According to Plaintiff, the ALJ "found obesity to be a severe impairment, but nowhere did she discuss it and indicate how and what impact it

has on Plaintiff's other significant impairments. . . ."  (Pl.'s Br. 21.)  For the reasons discussed below, Plaintiff's argument is not well taken.

The Social Security Administration ("SSA") considers obesity to be a medically determinable impairment.  S.S.R. 02-1p, Introduction, 2000 WL 628049, at *1 (S.S.A.). Although the Listings previously included obesity as an impairment, the SSA deleted it in 1999, and added paragraphs to the prefaces of the musculoskeletal, respiratory, and cardiovascular body system listings that provide guidance about the potential effects obesity has in causing or contributing to impairments in those body systems.  Id.  The SSA also recognizes that obesity may cause or contribute to mental impairments such as depression or the loss of mental clarity due to obesity-related sleep apnea.  S.S.R. 02-1p, Policy Interpretation Question 2, 2000 WL 628049, at *3.

Plaintiff contends that the ALJ's decision is "void of any discussion and evaluation of Plaintiff's obesity under SSR 02-1p."  (Pl.'s Br. 21.)  But Social Security Ruling 02-01p does not mandate a particular mode of analysis of obesity, as it states only that obesity, in combination with other impairments, "may" increase the severity of the other limitations.  Bledsoe v. Barnhart, 165 F. App'x 408, 411-12 (6th Cir. 2006) ("It is a mischaracterization to suggest that Social Security Ruling 02-01p offers any particular procedural mode of analysis for obese disability claimants.").  Nor does it require an ALJ to specifically reference the ruling in her analysis.  Accordingly, to the extent that Plaintiff argues that the ALJ violated Social Security Ruling 02-01p by failing to perform an analysis of Plaintiff's obesity in a particular manner, this argument lacks merit.

Although the rulings do not require a particular analysis of a claimant's obesity,

the ALJ's decision reflects that she considered Plaintiff's obesity at the relevant steps of the sequential analysis.  An ALJ must compare the medical evidence with the requirements for impairments in the Listings when considering whether a claimant's impairments, either singly or in combination, meet or medically equal any impairments in the Listings, *Reynolds v. Comm'r of Soc. Sec.*, 414 F. App'x 411, 414 (6th Cir. 2011), and the ALJ must consider all of a claimant's impairments, severe and not severe, when assessing the claimant's RFC, *see* 20 C.F.R. § 404.1545(e).  Here, there is no evidence that Plaintiff was assigned limitations based on her obesity.  The ALJ found Plaintiff's obesity to be a severe impairment, and explained that she considered Plaintiff's obesity in relation to the musculoskeletal, respiratory, and cardiovascular body systems listings.  (Tr. 14.)  The ALJ provided a thorough explanation as to why Plaintiff did not meet or equal the severity of the listings for respiratory system impairments, noting that Plaintiff did not meet the Listing for asthma because the record did not demonstrate chronic asthmatic bronchitis with pulmonary insufficiency.  (Tr. 14.)  The ALJ also engaged in a detailed discussion of why Plaintiff's impairments did not meet the Listing for sleep-related breathing disorders, noting that, *inter alia,* treatment records from Dr. Fernandes indicate that Plaintiff's sleep apnea is stable.  (Tr. 14-15.)  Additionally, the ALJ considered whether Plaintiff's impairments, including obesity, met or equaled in severity the criteria for Listing 6.02 (impairment of renal function), and found that the evidence did not demonstrate that Plaintiff required chronic hemodialysis, peritoneal dialysis, or a kidney transplant.  (Tr. 15.)

Further, although the ALJ did not explicitly indicate at the outset of her RFC discussion that she considered Plaintiff's obesity, she did note that she "considered all

symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. . . ." (Tr. 15.) Additionally, when assigning "great weight" to the RFC opinion of Plaintiff's treating physician, Dr. Orlop, the ALJ indicated that she "considered the effects of the claimant's obesity in making that assessment." (Tr. 21.) Plaintiff has not explained what evidence regarding obesity the ALJ failed to consider and how that evidence supports her claims for disability. The Court finds no basis to conclude that the ALJ failed to consider Plaintiff's obesity. Accordingly, this assignment of error lacks merit.

### 4. The ALJ Failed to Give Appropriate Weight to the Opinions of Plaintiff's Treating Physician.

In her fourth assignment of error, Plaintiff takes issue with the ALJ's consideration of the opinions of state consultative examiner Mr. Avery and treating physician Dr. Orlop. Plaintiff's arguments as to both of these sources are without merit.

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted). If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)). This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of*

28

*Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson,* 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain her reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id*.

Here, Plaintiff argues that the ALJ did not give "great weight to or controlling weight to Dr. Avery or to SA."[8]  (Pl.'s Br. 22.)  This argument is without merit, because the treating physician rule does not apply to Mr. Avery or the other consultative examiners who rendered opinions regarding Plaintiff's mental functioning.  A treating source is defined as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."  20 C.F.R. § 404.1502.  Generally, an ongoing treatment relationship exists when the patient sees or has seen the treating source with a frequency consistent with accepted medical practice for the type of evaluation required for the medical condition at issue.  *Id.*  State agency consultants, like Mr. Avery, are not treating sources; they are medical consultants who are members of a team that makes disability determinations in a State agency.  *See* 20 C.F.R. § 404.1616.  Thus, to the extent Plaintiff takes issue with the ALJ's failure to give controlling weight to the opinions of state psychological consultants like Mr. Avery, this argument fails, as the ALJ is not required to assign such weight to those opinions.

---

[8]     Plaintiff did not define this term.  Nevertheless, this Court will assume that "SA" refers to the other state reviewing psychologists who rendered opinions regarding Plaintiff's mental limitations.

Furthermore, the ALJ did not err in assessing the opinion of treating physician Dr. Orlop, as she gave "great weight" to his opinion and provided good reasons for not adopting the stringent restrictions Dr. Orlop placed on Plaintiff's ability to lift, push, or pull.  (Tr. 21.)  Dr. Orlop opined that Plaintiff was markedly limited in pushing and pulling and that she could lift only up to five pounds frequently.  (Tr. 386.) The ALJ noted that Plaintiff's testimony was inconsistent with such restrictions, as Plaintiff herself "reported that she can lift up to 20 pounds (Exhibit 8F), and she testified that she can lift a gallon of milk in each hand."  (Tr. 21.)  Plaintiff also testified that she could lift one gallon of milk above her head.  (Tr. 49.)  Furthermore, despite the cyst on her right hand, Plaintiff testified that she can cook, write, and type on a keyboard until her hand begins to stiffen.  (*Id.*)  As the ALJ explained, Plaintiff's record as a whole – including Plaintiff's self-described abilities – do not support Dr. Orlop's opinion regarding Plaintiff's ability to lift, push, or pull.  As a result, the ALJ did not violate the treating physician rule by rejecting this particular part of Dr. Orlop's opinion.  Accordingly, Plaintiff's fourth assignment of error does not present a basis for remand.

> **5.    The VE's Testimony was Based on an Improper Hypothetical and is not Consistent with the Actual Limitations Supported by the Record.**

Plaintiff raises a fifth assignment of error, which she has presented as follows: "VE TESTIMONY IS BASED ON IMPROPER HYPOTHETICAL AND SUCH VE TESTIMONY IS NOT CONSISTENT WITH THE ACTUAL MENTAL LIMITATIONS AND OTHER NONEERTIONAL [sic] LIMITATIONS SUPPORTED BY THE RECORD AS A WHOLE, RENDERING SUCH TESTIMONY, [sic] NOT BASED ON SUBSTANTIAL

EVIDENCE." (Pl.'s Br. 24.) While Plaintiff raises this issue, she includes no legal support for her argument, as she does not cite to any case law or regulations that would help guide this Court in analyzing the issue. Instead, Plaintiff offers a string of factual allegations followed by unsupported conclusions. Without reference to case law or regulations supporting Plaintiff's assertions, this Court cannot properly determine whether or not Plaintiff's fifth assignment of error has any merit. As a result of failing to explain, develop, or provide an analytical framework for this assigned error, Plaintiff has waived any argument on this point. *See Rice v. Comm'r of Soc. Sec.,* 169 F. App'x 452, 454 (6th Cir.2006) ("It is well-established that 'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *McPherson v. Kelsey,* 125 F.3d 989, 995–996 (6th Cir.1997)).

Furthermore, to the extent Plaintiff argues that the VE's testimony was based on an RFC that did not adequately account for Plaintiff's mental limitations, this argument is redundant and already has been addressed in the previous discussion of Plaintiff's first assignment of error. Accordingly, Plaintiff's fifth assignment of error does not present a basis for remand of this case.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

31

Date: November 12, 2013

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See* *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

32