IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Trina M. Smith,

    Plaintiff,        Case No. 3:13 CV 713

 -vs-

                 MEMORANDUM OPINION
                 AND ORDER

Commissioner of Social Security,

    Defendant.

 Trina M. Smith applied for social security disability insurance benefits and for supplemental security income benefits with the Social Security Administration. After exhausting her available administrative remedies, the Commissioner of Social Security denied Smith's applications for benefits.

 Smith then sought judicial review of the Commissioner's decision. The case was referred to Magistrate Judge Nancy A. Vecchiarelli for findings of facts, conclusions of law, and recommendations. The Magistrate Judge issued a report recommending I affirm the Commissioner's decision denying Smith's applications for benefits. This matter is before me pursuant to Smith's timely objections to the Magistrate Judge's report.

 I have jurisdiction over the Commissioner's final decision denying Smith's request for benefits pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832 (6th Cir. 2006). In accordance with *United States v. Curtis*, 237 F.3d 598, 602–03 (6th Cir. 2001), I have made a de novo determination of the Magistrate Judge's report. For the reasons stated below, I adopt the report and affirm the Commissioner's decision denying Smith's applications for

benefits.

## I.  STANDARD OF REVIEW

I have conducted a de novo review of those portions of the Magistrate Judge's report to which Smith objects.  28 U.S.C. § 636(b)(1).  In so doing, I have reviewed the Commissioner's decision to determine whether it is supported by substantial evidence.  42 U.S.C. § 405(g).  I "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).  I do not re-weigh the evidence, but must affirm the Commissioner's findings as long as there is substantial evidence to support those findings, even if I would have decided the matter differently, and even if there is substantial evidence supporting the claimant's position.  *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  Substantial evidence is more than a scintilla of evidence, but less than a preponderance.  It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citations and internal quotation marks omitted).  The Commissioner's decision is not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Id.* at 854–55.

## II.  DISCUSSION

Because Smith has not objected to the Magistrate Judge's factual summary of the case as set forth on pages one through fifteen of the report, I adopt the Magistrate Judge's findings.  The Magistrate Judge's uncontested summary of the case is as follows:

### I.     PROCEDURAL HISTORY
On May 12, 2009, Plaintiff filed applications for DIB, POD, and SSI and alleged a disability onset date of November 10, 2008.  (Transcript ("Tr.") 10.)   The applications were denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ").  (*Id.*)  On June 28, 2011, ALJ Melissa Warner held Plaintiff's hearing.  (*Id.*)  Plaintiff

2

appeared, was represented by an attorney, and testified. (*Id.*) A vocational expert ("VE") also testified. (*Id.*) On September 13, 2011, the ALJ found Plaintiff not disabled. (Tr. 7.) On January 28, 2013, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1.) On April 1, 2013, Plaintiff filed her complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this matter.[1] (Doc. Nos. 13, 14, 15.)

Plaintiff asserts the following assignments of error: (1) the ALJ did not accurately account for Plaintiff's low intellectual functioning; (2) the ALJ failed to properly consider Plaintiff's cardiovascular impairment; (3) the ALJ failed to properly consider Plaintiff's obesity; (4) the ALJ failed to give appropriate weight to the opinions of Plaintiff's treating physicians; and (5) the VE's testimony was based on an improper hypothetical and is not consistent with the actual limitations supported by the record.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Plaintiff was born in December 1970, and was 37-years-old on her alleged disability onset date. (Tr. 23.) She had at least a high school education and was able to communicate in English. (*Id.*) She had past relevant work as a home daycare provider and a teacher's aide. (*Id.*)

### B.  Medical Evidence

#### 1.  Physical Limitations

##### a.  Medical Reports

Plaintiff was admitted to St. Vincent Mercy Medical Center from April 15, 2003, through April 24, 2003, for congestive heart failure, pneumonia, uncontrolled hypertension, and obstructive sleep apnea. (Tr. 294.) She was stabilized on medications. (*Id.*) At discharge, she was advised that she could engage in regular activity with no restrictions. (*Id.*) Plaintiff followed up treatment at St. Vincent's Heart Failure Clinic and St. Vincent's Sleep Disorders Centers, where she was diagnosed with moderate obstructive sleep apnea. (Tr. 297-332, 333-338, 342-370.) Treatment notes indicate that Plaintiff was unable to tolerate either continuous positive airway pressure ("CPAP") or bilevel positive airway pressure ("BIPAP") due to a persistent cough and should instead treat with oxygen therapy. (Tr. 338.) Plaintiff was encouraged to lose weight, as doing so would help with her sleep apnea. (*Id.*)

Plaintiff also followed up with cardiologist Mohammed Alkhateeb, M.D., on July 29, 2003. (Tr. 454.) Extensive testing was negative for ischemia or other ongoing cardiac conditions. (Tr. 455-456.) Dr. Alkhateeb recommended a cardiac catheterization, but it appears this was never done, and Plaintiff told her nephrologist that she had refused. (Tr. 463, 767.) Dr. Alkhateeb's records do not indicate any symptoms of recurrent heart failure. (Tr. 454-497.) Plaintiff's most recent echocardiogram, performed May 3, 2010, indicated only mild findings, with a left ventricular ejection fraction of 45 percent. (Tr. 711-712.)

Plaintiff saw pulmonologist Karl Fernandes, M.D., from August 28, 2003, through February 18, 2010. (Tr. 394-414, 627-628.) After 2004, Plaintiff's visits were rare and sporadic; she saw Dr. Fernandes only four times from 2006 to 2010. (*Id.*) Dr. Fernandes's records indicate that Plaintiff

---

[1]Plaintiff's counsel is reminded that in accordance with this Court's Initial Order (Doc. No. 7), and the practice of law in federal courts generally, all factual recitations should be accompanied by citations to the record. Furthermore, all legal assertions must be accompanied by citations to appropriate cases or regulations.

was discharged from his practice on July 10, 2008, because she had stopped taking all of her medications on her own and had no need for further pulmonary treatment. (Tr. 394, 396.)

On March 5, 2009, Plaintiff returned to Dr. Fernandes due to congestion problems. (Tr. 394.) Dr. Fernandes reported that Plaintiff had stable sleep apnea treated with oxygen therapy at night due to Plaintiff's intolerance of CPAP. (*Id.*) Upon examination, Plaintiff's lungs were clear with good air movement and no wheezes, rhonchi, or rales, and her oxygen saturation level on room air was 97 percent. (*Id.*) She had no edema. (*Id.*) Dr. Fernandes diagnosed Plaintiff with acute sinusitis and prescribed medications. (Tr. 395.) After another year of absence from Dr. Fernandes' practice, Plaintiff saw Dr. Fernandes on February 18, 2010, with complaints of a chronic cough. (Tr. 627.) Dr. Fernandes noted that Plaintiff was not taking any pulmonary medications. (*Id.*) He determined that Plaintiff's cough was related to an acute episode of sinusitis and bronchitis. (Tr. 628.)

Plaintiff saw her primary care physician, Stanley Orlop, D.O., from June 13, 2003, through April 21, 2011. (Tr. 498-557, 587-602, 739-762.) Dr. Orlop initially diagnosed congestive heart failure, hypertension, obstructive sleep apnea, asthma/chronic obstructive pulmonary disease, and depression, but his records indicate that Plaintiff received most or all of her treatment for these conditions from her specialists. (*Id.*) On March 1, 2007, Dr. Orlop also diagnosed diabetes mellitus, type II. (Tr. 514.) Dr. Orlop prescribed oral Glucophage. (Tr. 511.) On July 3, 2009, a measure of Plaintiff's kidney function indicated stage 2 kidney disease (mild kidney damage). (Tr. 606.) As the ALJ noted, Dr. Orlop's treatment was generally limited to prescribing and adjusting Plaintiff's medications, and the clinical findings contained in his records are generally unremarkable other than laboratory reports showing high blood glucose levels and indicators of kidney disease. (Tr. 19, 498-557, 587-602, 739-762.)

On January 15, 2008, Dr. Orlop opined that Plaintiff can stand and walk for two to four hours in an eight-hour day, up to one hour without interruption; she can sit for up to six hours in an eight-hour day, two hours without interruption; she can lift and carry up to five pounds frequently; and she is markedly limited in pushing and pulling and moderately limited in bending. (Tr. 386.) Dr. Orlop concluded that Plaintiff is employable with such restrictions. (*Id.*) In a separate document of the same date, Dr. Orlop opined that Plaintiff cannot stand, sit, or walk for long periods, perform heavy lifting, or tolerate temperature extremes. (Tr. 523.)

On October 18, 2010, Dr. Orlop referred Plaintiff to a nephrologist, Molly Litvin, D.O. (Tr. 763-776.) Plaintiff reported feeling fairly well and denied having any problems with shortness of breath, significant lower extremity swelling, urinary symptoms, chest pain, or unusual fatigue. (Tr. 767.) She had no edema on examination. (*Id.*) On October 29, 2010, Dr. Litvin referred Plaintiff for an echogram of her kidneys, which showed mild chronic renal disease and simple renal cysts. (Tr. 715.) Dr. Litvin diagnosed chronic kidney disease, stage II, secondary to hypertensive/diabetic nephrosclerosis, as well as hypertension, mild hypokalemia, and proteinuria. (Tr. 764, 768.) She adjusted Plaintiff's medications. (Tr. 765, 769.)

   **b.** **Agency Reports**

On September 22, 2009, Plaintiff underwent a consultative examination by William Padamadan, M.D. (Tr. 578-580.) An examination of Plaintiff's lungs was normal overall, and she had no edema. (Tr. 579-580.) Dr. Padamadan diagnosed morbid obesity, a history of obstructive sleep apnea on a CPAP and oxygen at night, hypertension, type II diabetes, and a history of asthma, which he reported was more compatible with obstructive sleep disorder and obesity. (Tr. 580.) Dr. Padamadan opined that Plaintiff may have difficulty climbing poles or ladders, balancing on beams,

4

and walking on scaffolds. (*Id.*) He did not indicate any other physical limitations, and noted that Plaintiff's communication skills and attention span were excellent. (*Id.*)

On November 17, 2009, state agency medical consultants Dr. McCormack and Dr. Steinberg determined that Plaintiff's impairments of asthma, obstructive sleep apnea, diabetes mellitus, and hypertension are non-severe impairments, and that her cardiac condition is not a medically determinable impairment. (Tr. 585-586.)

### 2. Mental Limitations
#### a. Medical Reports

Plaintiff was prescribed Lexapro while being treated at the St. Vincent's Heart Failure Clinic in 2003, as she was observed to have a flat affect and admitted to feeling depressed. (Tr. 348, 350.) Treatment notes from January 2004 indicate that Plaintiff reported feeling better, believing Lexapro was effective; however, she later indicated that she never actually took the medication because she was afraid of potential side effects. (Tr. 347, 442.)

On June 7, 2007, Plaintiff sought treatment at Unison Behavioral Health Group ("Unison"), for episodes of depression. (Tr. 426-453.) She reported not wanting to get out of bed, being constantly irritated and tired, isolating herself, and having crying spells, difficulty concentrating and sleeping, and suicidal thoughts and hallucinations. (Tr. 442.) She attributed her depression to illness and financial difficulties. (Tr. 440, 442.) Upon examination, Plaintiff had a down mood with a congruent affect, but fair insight and judgment, normal psychomotor activity, and no significant deficits in memory, attention, or concentration. (Tr. 441.) Her intellect was average, per verbal communication. (*Id.*) Plaintiff's Global Assessment of Functioning ("GAF") score was estimated to be 55.[2] (Tr. 441, 448.) Tufal Khan, M.D., diagnosed Plaintiff with depressive disorder, started her on a trial of Celexa, and referred her for counseling. (Tr. 441.)

By June 9, 2008, Plaintiff reported that she was doing well and had no problems with sleep, appetite, interest, energy, mood instability, or irritability. (Tr. 439.) She had been exercising and was feeling good about herself. (*Id.*) Upon examination, her mood was euthymic, her affect was full, her thought process was linear and goal-directed, and her thought content was negative for hallucinations or delusions. (*Id.*) She denied any suicidal or homicidal ideations and had no significant deficits in memory, attention, or concentration. (*Id.*)

On February 23, 2009, Plaintiff reported that her depression was under control. (Tr. 432.) At an appointment with Dr. Khan on March 23, 2009, Plaintiff said that she was doing "okay" and did not have any complaints. (Tr. 429.) On examination, her thought process was linear and goal-directed, her thought content was negative for hallucinations or delusions, and she denied any suicidal or homicidal ideations. (*Id.*) As the ALJ noted, although the remainder of Dr. Khan's records show that Plaintiff had periods of exacerbation due to family stressors, the clinical findings upon mental status examinations of Plaintiff continued to be generally unremarkable. (Tr. 20, 426-453.)

Records from Unison indicate that Plaintiff stopped receiving psychological treatment in 2009, but became symptomatic again after being off her medication for more than six months. (Tr.

---

[2]The GAF scale incorporates an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health illness devised by the American Psychiatric Association. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

5

668-710.) She returned to counseling on May 17, 2010, and began seeing Irfan Ahmed, M.D. (Tr. 683.) On examination, Plaintiff was found to be depressed and withdrawn, but not suicidal or homicidal. (*Id.*) Plaintiff was prescribed Wellbutrin and provided with supportive therapy. (Tr. 683-684.) At her next appointment, she reported paranoia and anxiousness after taking Wellbutrin. (Tr. 679.) She appeared "very sick and tired" and looked withdrawn and depressed but interactive. (*Id.*) On April 2, 2010, Plaintiff looked depressed and upset and cried during her interview with Dr. Ahmed. (Tr. 677.) She reported having been off her medication for over a month. (*Id.*) By the end of August 2010, Plaintiff's symptoms had improved significantly with treatment and medication. (Tr. 674.) She had been taking her medication regularly and tolerating it well, reporting no side effects, and she denied any worsening symptoms of depression. (*Id.*) At her most recent visit with Dr. Ahmed on May 19, 2011, Plaintiff reported feeling well on her current medication. (Tr. 668.)

    **b.**   **Agency Reports**

  On July 6, 2005, Plaintiff underwent a consultative psychological examination by Roger Avery, Ed.S., in connection with a prior claim for benefits. (Tr. 373-379.) Plaintiff reported that she did not have any problems performing physical activities, and that she had refused to take any medications for her psychological symptoms. (Tr. 373-374.) At the time of the evaluation, she was working 20-25 hours per week at a summer program where she fed children in the community. (Tr. 374.) Upon evaluation, Plaintiff attained an IQ score of 71, which was at the bottom end of the borderline range for intellectual functioning. (Tr. 377.) She attained memory test scores in the mildly mentally retarded range. (Tr. 378.) Her reading comprehension scores were at the 5.5 grade level. (*Id.*) Mr. Avery diagnosed major depressive disorder, noncompliance with treatment, a relational problem, a reading disorder, and a personality disorder. (*Id.*) He estimated Plaintiff's GAF to be 50-55. (*Id.*) Mr. Avery concluded that Plaintiff had a moderate to marked impairment in her ability to understand, remember, and follow directions due to her memory problems, and moderate impairments in other work-related mental functioning due to her borderline intellectual abilities. (Tr. 379.)

  On August 24, 2009, Patricia Semmelman, Ph.D., completed a psychiatric review technique and a mental residual functional capacity ("RFC") assessment. (Tr. 558-571, 572-575.) Dr. Semmelman opined that Plaintiff has a mild restriction in her activities of daily living, moderate difficulties in social functioning, and no difficulties in maintaining concentration, persistence, and pace. (Tr. 568.) Dr. Semmelman concluded that Plaintiff can interact occasionally and superficially in a non-public setting and cope with ordinary and routine changes in an environment without a fast pace or high demand. (Tr. 574.)

**C.**   **Hearing Testimony**
  **1.**   **Plaintiff's Testimony**

  Plaintiff was 40-years-old at the time of her hearing and had a 20-year-old daughter and 15-year-old son. (Tr. 39.) She has a driver's license and has no difficulties driving. (*Id.*) She completed high school and is able to read, write, and do basic math. (*Id.*) The last time she worked was November of 2008 in a daycare. (Tr. 40.) She also has past work experience as a teacher's aide and in a summer program where she cooked for and fed children. (Tr. 55.) When asked what keeps Plaintiff from working, she testified that she gets tired easily and is constantly going to the restroom. (Tr. 40.) She stated that this has been going on since she was diagnosed with congestive heart failure in 2003. (*Id.*) She testified that she still experiences pain in her chest. (Tr. 52.) She sometimes uses oxygen during the day when she becomes really exhausted. (*Id.*)

  Plaintiff sleeps about six hours on an average night. (Tr. 42.) She often gets up in the

6

middle of the night to use the restroom. (*Id.*) She suffers from depression, which started when she first got sick. (Tr. 43.) The medications she takes for her depression are helpful. (*Id.*) She still has feelings of isolation about once or twice a month. (Tr. 43-44.)

On a typical day, Plaintiff takes her kids places, naps, and prepares meals. (Tr. 44.) Her children do most of the chores, but she can do laundry and cook. (*Id.*) Plaintiff watches TV, reads, and takes her children to the movies. (Tr. 44, 47) She watches reality TV and is usually able to follow what is going on in the shows. (Tr. 44.) She is able to shower, dress, and feed herself. (*Id.*) She can walk about 20 minutes before she gets tired and has to sit down. (Tr. 45.) She believes she could walk about a block and a half before having to stop. (Tr. 49.) She can stand for about 15 or 20 minutes before her feet begin to hurt and her ankles begin to swell. (Tr. 45.) When she lies down at home, she elevates her feet. (*Id.*) Plaintiff can sit for about an hour. (*Id.*) When asked what keeps her from sitting longer, she replied, "I don't know, I just never sit that long." (*Id.*) She testified that she can lift a gallon of milk in each hand. (Tr. 45-46.) She can lift one gallon of milk above her head. (Tr. 49.) She can bend and touch her knees or the floor. (Tr. 46.) She can climb stairs. (*Id.*)

Plaintiff has a cyst on her right hand. (*Id.*) She is right-handed. (*Id.*) She testified that sometimes her fingers go numb because of the cyst on her hand. (Tr. 47.) Plaintiff stated that doctors want to do surgery on her hand, but that she does not want to have the surgery because "[i]t's not broke yet, so I'm not going to fix it." (*Id.*) Despite the cyst, Plaintiff can still cook, write, and type on a keyboard until her hand begins to stiffen. (*Id.*)

Plaintiff does not get along with other people very well. (*Id.*) "Because I'm older now, and I don't take, I don't deal with people's mess too much." (*Id.*)

Plaintiff has sleep apnea, which she testified would be better if she used her breathing machine more often. (Tr. 48.) She does not use the machine because she has to get up at least three or four times per night to use the bathroom. (*Id.*) Plaintiff testified that she has a respiratory problem, but that it is getting better due to the use of an inhaler. (*Id.*)

Plaintiff has retinopathy in her left eye. (Tr. 50.) She goes to an eye doctor every six months to make sure it does not get any worse. (*Id.*) She also has cysts on her kidneys and is in the beginning stages of kidney disease. (*Id.*) Over the last three or four years, Plaintiff has lost interest in going places. (Tr. 50-51.) She still goes to the movies with her kids, but not as often as she used to. (Tr. 51.) "You know I can't just sit there and watch a movie, a whole movie. I have to go to the restroom." (*Id.*)

    2.    **VE Testimony**

A vocational expert, Mr. McBea, testified at Plaintiff's hearing. (Tr. 54.) The ALJ told him to assume a hypothetical individual vocationally situated as Plaintiff, who can perform all the functions of light work except only occasional climbing of stairs and stooping; no climbing of ladders; frequent fingering; no exposure to temperature extremes and humidity; occasional exposure to respiratory irritants; no exposure to obvious hazards; work at a specific vocational preparation ("SVP") of one to two[3]; occasional contact with the general public; and occasional keyboard use.

---

[3]SVP ratings indicate how long it takes a worker to learn how to do his or her job at an average performance level. A rating of SVP 1 means a short demonstration is the amount of training required to learn the job, and a rating of SVP 2 means up to one month of training is required to learn the job.

7

(Tr. 56-57.) The VE testified that the hypothetical individual could perform work at the light exertional level, which would include jobs such as an inspector or hand packager (3,000 jobs in Ohio; 125,000 nationally); a bagger of garments (2,000 jobs in Ohio; 100,000 nationally); and a photocopy machine operator (1,500-2,000 jobs in Ohio; 100,000 nationally). (Tr. 57-58.) The VE testified that the individual could perform the aforementioned jobs even with a sit/stand option allowing the individual to change positions every thirty minutes for one to two minutes in the immediate vicinity of the workstation. (Tr. 58.)

The ALJ presented a second hypothetical where the individual previously described would have a sit/stand option and could sit for six out of eight hours, stand or walk for two out of eight hours, and lift 20 pounds occasionally and ten pounds frequently. (*Id.*) The VE testified that if the individual had to sit the majority of the time, other occupations would be more appropriate than the ones he previously mentioned, such as a production assembler (10,000-13,000 jobs in Ohio; 180,000 nationally); a small products assembler (10,000 jobs in Ohio; 175,000 nationally); and a blending tank helper (1,500 jobs in Ohio; 90,000 nationally). (Tr. 59.)

The VE testified that ordinary breaks in the course of a workday include a 15-minute break in the morning, a 15-minute break in the afternoon, and generally a 30-minute lunch. (*Id.*) The VE further stated that consistently missing more than one day of work per month and beyond any sick time or vacation time normally allotted would result in a severe reprimand for the employee and ultimately dismissal. (Tr. 59-60.) According to the VE, an accumulation of ten missed workdays over the year also results in termination, and at an entry level job there is generally a 90-day probationary period when no days can be missed. (Tr. 60.) The VE also testified that in competitive employment, generally one is required to be on-task for a minimum of at least 80 percent of the day, which includes breaks. (*Id.*) To go beyond that would preclude employment. (*Id.*) As for restroom breaks, the VE explained: "On an unscheduled basis, generally in competitive employment, one is given restroom breaks as needed. However, when those restroom breaks become to the point where the individual's off-task as I have stated earlier, reaching that 20 percent or more, then that's when it becomes a problem for the employer, and the employer again will meet the employee with reprimand or dismissal." (*Id.*)

Plaintiff's counsel presented a hypothetical to the VE, which included the same limitations as stated by the ALJ, but added that the individual would be limited to superficial interaction with co-workers and supervisors and no contact with the public. (Tr. 60-61.) The VE opined that the jobs he previously identified would not meet that hypothetical. (Tr. 61.)

Plaintiff's counsel then presented another hypothetical to the VE: the individual can walk two to four hours in an eight-hour workday for only a half-hour to one hour at a time; sit four to six hours in an eight-hour workday for only two hours at a time; and can lift up to only five pounds maximum frequently and five pounds occasionally. (Tr. 61.) The hypothetical individual is markedly[4] limited in pushing and pulling, moderately[5] limited in bending, and is not limited in reaching or handling but could only have very occasional use of a keyboard. (Tr. 62.) The

---

[4]Plaintiff's counsel defined "markedly" limited as meaning the individual could not perform the task up to two-thirds of the day. (Tr. 61.)

[5]Plaintiff's counsel defined "moderately" limited as meaning the individual could not perform the task up to one-third of the day. (Tr. 62.)

8

individual has a 5.5 grade reading and comprehension level, borderline intellectual functioning, and would need to be in a low-stress job that does not involve a high pace of production. (Tr. 63.) The VE testified that the hypothetical individual Plaintiff's counsel described would not be able to perform any work in the national economy. (Tr. 64.)

### III. STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). To receive SSI benefits, a recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. Plaintiff meets the insured status requirements of the Social Security Act through September 30, 2009.

2. Plaintiff has not engaged in substantial gainful activity since November 10, 2008, the alleged onset date.

3. Plaintiff has the following severe impairments: obesity; obstructive sleep apnea; asthma; diabetes mellitus with chronic kidney disease; borderline intellectual functioning; and a major depressive disorder.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

9

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk for two hours in an eight-hour workday, sit for six hours in an eight-hour workday, and requires the option to change positions every 30 minutes for one to two minutes while remaining in the immediate vicinity of her work station. She cannot climb ladders, but can occasionally climb stairs, stoop, and use a keyboard, and can frequently finger. She cannot tolerate exposure to temperature extremes, humidity, or obvious hazards, but can occasionally tolerate exposure to respiratory irritants. She is limited to work involving specific vocational preparation of Level 1 or Level 2, with only occasional contact with the general public.

6. Plaintiff is unable to perform any past relevant work.

7. Plaintiff was born in December 1970, and was 37-years-old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8. Plaintiff has at least a high school education and is able to communicate in English.

. . . . .

10. Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

11. Plaintiff has not been under a disability, as defined in the Act, from November 10, 2008, through the date of this decision.

(Tr. 12-24.)

### III. SMITH'S ARGUMENTS

When filing objections to a magistrate judge's report, the Sixth Circuit has held general objections are insufficient. *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995). "The objections must be clear enough to enable the district court to discern those issues that are dispositive and contentious." *Id.* (citing *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508–09 (6th Cir. 1991)). In many respects, Smith's objections do not satisfy this standard. The objections are cryptic and confusing, requiring me to construe the meaning of some of her objections.

Smith argues because she has borderline intellectual functioning, the usual assumptions about her ability to learn differs from what is contemplated by 20 C.F.R. § 404.1568. She also contends the ALJ's hypothetical questions to the vocational expert did not account for her borderline intellectual test scores, specifically those found by Mr. Roger Avery, Ed.S. Smith believes she should be restricted to simple, repetitive, one or two-step jobs. Substantial evidence, however, supports the Commissioner's decision regarding this issue.

The ALJ stated she gave "some" weight to Mr. Avery's opinion because the evidence does not show Smith's memory impairment is as severe as what Mr. Avery indicated. This is underscored by the fact Smith performed semi-skilled work in the past, even *after* Mr. Avery's evaluation. Smith's own treating psychiatrist, Dr. Tufal Khan, found Smith had no significant deficits in her memory, attention, or concentration in his initial examination in 2007. Thus, the ALJ provided a satisfactory explanation regarding why she did not fully adopt Mr. Avery's opinions.

The record establishes some of Mr. Avery's findings conflicted with the findings of Dr. Khan and the record as a whole. It is the Commissioner's responsibility to resolve these conflicts. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). Given Mr. Avery's findings are not entirely supported by the record and were properly rejected in part, the ALJ was not required to incorporate Mr. Avery's entire findings into hypothetical questions to the vocational expert. "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

Smith asserts Mr. Avery's findings should be considered a "treating source . . . entitled to the greatest weight." The controlling decision on this issue is *Cole v. Astrue*, 661 F.3d 931 (6th Cir. 2011). In *Cole*, the court noted the Commissioner has elected to impose certain standards on the

11

treatment of "medical source evidence." *Cole*, 661 F.3d at 937; *see also* 20 C.F.R. § 404.1502. Under what is commonly known as the "treating physician rule," *Cole*, 661 F.3d at 937, the Commissioner requires an ALJ to give a treating physician's opinion controlling weight if the opinion "'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Cole*, 661 F.3d at 937 (quoting 20 C.F.R. § 404.1527(d)(2)). Mr. Avery is not a doctor. Therefore, the treating physician rule, discussed in *Cole*, is not applicable to Mr. Avery.

Smith argues because the ALJ found her cardiovascular impairment was not severe, "when looking at the decision as a whole . . ., points to [the] failure of the ALJ to consider the cardiovascular impairment." In her opinion, the ALJ extensively discusses Smith's cardiovascular history. The ALJ noted Smith had a history of congestive heart failure and was hospitalized for the condition in 2003, prior to the onset date of her alleged disability. The ALJ found the condition did not result in more than a minimal work-related limitation. The ALJ further found "that, other than its possible role in the development of the claimant's kidney disease . . ., the record does not show that the claimant's hypertension, in and of itself, has more than a minimal effect on her ability to work." Contrary to Smith's argument, the ALJ did not "leave out" consideration of her cardiovascular impairments. The conditions were considered, addressed, and a finding regarding those conditions was made.

Smith contends her hypertension is a severe impairment. Smith has the burden of showing this impairment significantly limited her ability to perform basic work-related activities. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391–92 (6th Cir. 1999). Smith's arguments are confusing regarding her hypertension diagnosis. To the extent Smith feels she has established that the condition is severe so as to continue the disability analysis, the question is moot because she has numerous other

conditions which have been found to be severe.  Thus, Smith has satisfied her burden under step two of the sequential evaluation by establishing she has a severe condition or conditions, allowing further consideration of her disability applications.

Smith also discusses how her hypertension, combined with her obesity and several other conditions, have limited her ability to work.  Smith's obesity, chronic kidney disease, shortness of breath, have all been found to be severe impairments by the Commissioner and were found to limit Smith's ability to work  Given the unclear reasons for this objection, and after having reviewed the Magistrate Judge's report, I conclude there is substantial evidence to support the Commissioner's opinion regarding Smith's hypertension.

Smith contends the Magistrate Judge "glosses over" Social Security Ruling 02-1p regarding obesity.  Smith states the Commissioner did not properly evaluate the impact her obesity had on her other impairments.  What "the ALJ did not discuss [is] in what way or to what extent that obesity impacts claimant's ability to do work related activities or to what extent because of the obesity" her residual functional capacity is compromised.  The Sixth Circuit has stated:

> Social Security Ruling 02–01p does not mandate a particular mode of analysis.  It only states that obesity, in combination with other impairments, "may" increase the severity of the other limitations.  It is a mischaracterization to suggest that Social Security Ruling 02–01p offers any particular procedural mode of analysis for obese disability claimants.  Thus, the ALJ did not err when considering Bledsoe's obesity as a factor in whether she has a "listed impairment."

*Bledsoe v. Barnhart*, 165 F. App'x 408, 411–12 (6th Cir. 2006).

To the extent Smith is arguing the ALJ failed to to perform a specific analysis regarding her obesity, no such requirement exists under the ruling.  *Id.*

Smith states the "boiler plate broad stroking of verbiage that provides no basis for a reviewing court to understand in what way the ALJ considered obesity."  The ALJ stated in Finding

Three the impairments which she listed, including obesity, imposed more than minimal limitations on Smith's ability to work. Finding Four establishes the impairments were considered individually and in combination for a determination of whether Smith satisfied a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. In Finding Five, the ALJ states she considered all of Smith's symptoms to the extent they could be reasonably accepted as consistent with the objective medical evidence in the record. The ALJ further stated she "considered the effects of the claimant's obesity in making" her assessment. Because the ALJ repeatedly stated she considered Smith's conditions, the statements are sufficient to establish the obesity condition was evaluated by the ALJ. *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592–93 (6th Cir. 1987).

Smith contends the ALJ erred by rejecting the lifting restrictions placed upon her by Dr. Orlop. The ALJ noted Dr. Orlop had concluded Smith was employable and gave his opinion "great weight." The ALJ stated she did not accept the doctor's lifting, pushing, and pulling restrictions because they were contrary to Smith's testimony.

It is the Commissioner's responsibility to resolve these conflicts. *King*, 742 F.3d at 974. Under *Cole*, if the ALJ declines to give a treating physician's opinion controlling weight, the ALJ must then balance the following factors to determine what weight to give the opinion: 1) the length of the treatment relationship and the frequency of the examination; 2) the nature and extent of the treatment relationship; 3) the supportability of the opinion; 4) the consistency of the opinion with the record as a whole; and 5) the specialization of the treating source. *Cole*, 661 F.3d at 937 (citations omitted).

The Commissioner requires decision makers to "'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'" *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)). The reasons must be supported by the evidence and must be sufficiently

14

specific to inform any subsequent reviewer of the weight given to the treating source's medical opinion, along with the reasons for the weight. *Id.* (citation omitted). Here, the ALJ properly resolved the conflict in the evidence regarding Smith's lifting restrictions and correctly evaluated Dr. Orlop's opinion in accordance with *Cole*. The Commissioner's decision regarding this argument is supported by substantial evidence.

Finally, the Magistrate Judge notes Smith asserted the vocational expert's testimony was based on improper hypothetical questions and not supported by the evidence in the record. The Magistrate Judge stated Smith provided no legal support for her argument, offering a string of factual allegations followed by unsupported conclusions. In her objections, Smith blames her inability to delve into her argument on this district's page restrictions for briefs. The excuse is frivolous. The Sixth Circuit has noted: "'It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.'" *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (quoting *Citzens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995)). The vocational expert's testimony is supported by the medical evidence in the record. Therefore, the Commissioner's reliance of the vocational expert's testimony was proper.

## IV. CONCLUSION

Accordingly, the Magistrate Judge's report and recommendation is adopted and the Commissioner's denial of Smith's applications for social security disability insurance benefits and for supplemental security income benefits is affirmed.

So Ordered.

    s/ *Jeffrey J. Helmick*
United States District Judge